## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Trooper Michael B. Traister, being sworn, state as follows:

### INTRODUCTION

1. I have been a Massachusetts State Police Trooper since April 2016. I am currently assigned to the Division of Investigative Services, Special Investigations Unit of the Massachusetts State Police and to the Federal Bureau of Investigation (FBI) Violent Crimes Task Force in Boston, Massachusetts. I am a graduate of the Boylston Police Academy, and I hold a bachelor's degree in criminal justice from Northeastern University's College of Criminal Justice in Boston, Massachusetts. I am also a graduate of the Massachusetts State Police Academy and I have received training from the Massachusetts State Police which includes, but is not limited to: motor vehicle law, motor vehicle fatalities, unattended deaths, narcotics violations, domestic violence, armed and unarmed robbery, breaking and entering, larceny investigations, and computer crimes.

2. As a Task Force Officer, I have directed, conducted, and participated in many investigations of criminal violations of various federal laws, including investigations of extortion, kidnapping, narcotics offenses, weapons violations, and armed/unarmed bank robberies. In the course of those investigations, I have executed search and arrest warrants, utilized informants, interviewed witnesses, and conducted surveillance. Additionally, I am authorized to investigate violations of the laws of the United States and I am a law enforcement officer with the authority to execute federal arrest warrants.

3. I submit this affidavit in support of a criminal complaint and arrest warrant charging Keywan Kelly ("KELLY"), year of birth 1995, with armed bank robbery, in violation of 18 U.S.C. § 2113.

1

4. The information contained in this affidavit is based upon my involvement with this investigation, information supplied to me by other law enforcement officers, review of law enforcement reports, surveillance video footage, cell phone call records, cell phone location data, public records, and records supplied in response to grand jury subpoenas. This affidavit is being submitted for the limited purpose of establishing probable cause to secure a criminal complaint and arrest warrant. As such, I have not included each and every fact of this investigation, but instead have set forth only the most relevant facts that establish the requisite probable cause.

## STATEMENT OF PROBABLE CAUSE
### WEYMOUTH ROBBERY

5. On Monday, July 1, 2024, at approximately 11:52 a.m., officers from the Weymouth Police Department and Troopers assigned to the FBI Violent Crimes Task Force, including myself, responded to an armed bank robbery at Bank of America located at 525 Washington Street in Weymouth, Massachusetts.

6. I have reviewed reports authored by officers from the Massachusetts State Police and Weymouth Police Department related to the robbery. The reports recount the responding officers' interviews with the victim and witnesses. According to the reports, a bank teller ("VICTIM 1") had just returned from lunch and attended to one customer when a man (the "robber") walked up to his teller window. The robber pushed a note toward VICTIM 1, then said "Bro" and forced the note towards VICTIM 1 again.

7. According to the reports, VICTIM 1 described the note as handwritten with a black Sharpie on white lined paper and said that it contained words to the effect of "Give me $20,000, I'll kill you all." After reading the note, VICTIM 1 handed the robber $15,000. VICTIM 1 knew the amount because he had just received the cash box after lunch. The robber then demanded more money, and VICTIM 1 gave him approximately $4,000 to $5,000.

2

8. VICTIM 1 also said that the robber made verbal threats such as "Run that shit before I blow this place up" and "I'll kill all of you." VICTIM 1 reported that he was in a significant state of fear, not only for himself but for his coworkers.[1]

9. VICTIM 1 told investigators that once the robber appeared satisfied with the amount of money he received, he demanded that VICTIM 1 give him his note back, and VICTIM 1 complied. The robber then left the bank.

10. VICTIM 1 described the robber as a black male around 5'6" to 5'7" tall, in his late 20's, and wearing all black clothing, including a black hooded sweatshirt with a white logo on the left chest area. The robber was also wearing a blue medical mask and blue latex gloves.

11. Investigators also spoke with a witness ("WITNESS 1"). WITNESS 1 reported that he was inside the bank when a slender black male wearing gloves and a medical mask entered the bank. WITNESS 1 observed the robber produce a handgun, which he described as having a silver slide. After witnessing the entire robbery, WITNESS 1 followed the robber outside. WITNESS 1 saw the robber run across the street and enter a white Nissan sedan bearing Massachusetts registration 2HLA32 ("SUBJECT VEHICLE 1"). WITNESS 1 attempted to follow SUBJECT VEHICLE 1, and last saw it on Washington Street heading towards the town of Braintree. WITNESS 1 was able to take a picture of the rear of SUBJECT VEHICLE 1 with the registration plate visible, which he provided to investigators.

12. Officers also obtained security camera footage that was maintained by the bank. I have reviewed the images captured by those security cameras. In the images, I observed the robber entering the bank and standing at VICTIM 1's teller window. The robber appeared to be a slender

---

[1] According to initial reports, VICTIM 1 did not report seeing a handgun. However, surveillance footage makes clear that the robber did brandish a handgun during the robbery.

black male wearing a black sweatshirt with a white "Carhart" logo on the chest and "Carhart" in white lettering on the side of the sleeve. The hood of the robber's sweatshirt was pulled up over his head with the drawstrings pulled tightly around his face. The robber was also seen wearing a blue medical mask and blue gloves. The surveillance footage showed the robber's left hand concealed in his front pocket as he entered the bank.

13. Surveillance footage also showed the robber standing at VICTIM 1's teller window, holding a note written on what appears to be white notebook paper with large black lettering. The note is not entirely legible in the footage, but appears to say, "I need 20,000." The robber is also seen holding a silver handgun with a black slide on the top in his right hand and is pointing the handgun toward VICTIM 1.

14. Surveillance footage outside of the bank shows the robber walking toward a CVS parking lot, where a white sedan appearing to match the description of SUBJECT VEHICLE 1 was parked.

## JAMAICA PLAIN ROBBERY

15. On July 16, 2024, officers from the Boston Police Department and troopers assigned to the FBI Bank Robbery and Violent Crimes Task Force, including myself, responded to a report of an armed robbery of the Rockland Trust Bank located at 515 Centre Street in Jamaica Plain, MA. I have reviewed reports authored by officers from the Massachusetts State Police, Boston Police Department, and the FBI. The reports recount the responding officers' interviews with the victim and witnesses.

16. According to the reports, at approximately 1:41 p.m. a male described varyingly as "dark-skinned" and "light brown/black", wearing a black balaclava style mask, black clothing, and white latex gloves entered the Rockland Trust bank. The suspect was described as a black male,

4

approximately 5'5" to 5'7" tall, slender, and approximately 25-35 years old.

17. According to reports, the robber approached the teller station, and handed a teller ("VICTIM 2") a handwritten note demanding $20,000 and threatening to kill everyone. VICTIM 2 was assisting a customer and did not immediately read the note. The robber then verbally demanded that VICTIM 2 "take care of [him] now," and pulled up his clothing to display a firearm. The robber then pulled the firearm from his waistband and verbally demanded money. VICTIM 2 described the firearm as black on top and silver/gray on the bottom. VICTIM 2 then handed the robber cash totaling approximately $2,480. The robber asked VICTIM 2 to return the demand note, and VICTIM 2 told the robber that she did. The robber fled the bank on foot.

18. VICTIM 2 reported that after the robber left the bank, she realized that she still had the demand note. Investigators obtained the note and I have reviewed it. The note, written with pen on lined notepad paper, read: "I need 20K no DyPacks I have 4 bombs I'll Kill everyone make quick."

19. Officers also obtained security camera footage that was maintained by the bank. I have reviewed the footage captured by those cameras. I observed the robber enter the bank and push between two customers to approach VICTIM 2's teller counter. The robber appeared to be a slender black male wearing black clothing. I also observed the robber push a piece of paper onto the teller counter. I then observed the robber pull a handgun from his waistband. The handgun appeared to be silver with a black slide on the top.

20. The surveillance footage also showed a vehicle resembling a red Volkswagen Taos ("SUBJECT VEHICLE 2") departing from the area around the bank at approximately 1:43 p.m. following the robbery.

5

21. Officers also obtained Ring surveillance footage from a residence located on a side street in the vicinity of Rockland Trust. I have reviewed that footage. The footage depicts a vehicle resembling a red Volkswagen Taos in the vicinity of Rockland Trust at approximately 1:32 p.m., less than ten minutes prior to the robbery.

## HYDE PARK ROBBERY

22. On July 26, 2024, at approximately 10:15 a.m., officers from the Boston Police Department responded to an armed bank robbery at the Rockland Trust Bank located at 1065 Truman Pkwy., Hyde Park, MA.

23. I have reviewed a report authored by BPD officers related to the robbery. The report recounts responding officers' interviews with the victim teller. According to the report, a black male wearing all black with a black mask approached the counter where a teller ("VICTIM 3") was working. VICTIM 3 described the robber as being in his 20's, 5'5" to 5'9" tall and having a small build.

24. According to the report, the robber passed a note to VICTIM 3 that said, "you're being robbed give me cash." The robber then pulled out a firearm and pointed it at VICTIM 3. VICTIM 3 described the firearm as a black pistol. The robber verbally threatened to "shoot" and demanded $20,000.

25. VICTIM 3 gave the robber approximately $3,000 in cash. VICTIM 3 reported that the robber also took back the demand note. The robber then fled the bank.

26. Officers also obtained security camera footage that was maintained by the bank. I have reviewed that surveillance footage. In the footage, I observed a slender black male, dressed in all black, and appearing to be wearing a black balaclava style mask and gloves enter the bank and approach a teller counter at approximately 10:09 a.m. according to the time stamp on the

6

surveillance footage. The robber appeared to place a piece of paper on the counter in front of a teller (VICTIM 3). The robber also brandished a firearm that appeared to be gray/silver and black.

27. In the footage, I also observed the robber retrieve the piece of paper that he had placed on the teller counter. The robber fled the bank at approximately 10:11:07 a.m. according to the timestamp on the surveillance footage.

28. Officers also obtained video footage recorded by a Ring doorbell camera from a residence located on Truman Parkway. I have reviewed this footage. In the footage, I observed a male dressed in all black running down the street and entering the passenger side of a black sedan at approximately 10:11:45 a.m., less than a minute after the robber was observed exiting the bank according to the bank surveillance footage. The black sedan appeared to be a BMW with 5-spoke rims and a sunroof. No registration plate was visible in the video footage. According to employees of the National Insurance Crime Bureau who reviewed the image, the vehicle appeared to be a 2006-2009 BMW 328i ("SUBJECT VEHICLE 3").

### Identification of SUBJECT VEHICLE 1 and KELLY

29. According to Massachusetts Registry of Motor Vehicle ("RMV") records, SUBJECT VEHICLE 1, a white 2018 Nissan Altima bearing Massachusetts registration 2HLA32, is registered to UNI Auto Rental Inc. at 369 Salem Street, Malden, MA.

30. In the evening hours of July 1, 2024, I, along with other investigators, observed the Nissan Altima at its registered location, UNI Auto Rental Inc. in Malden. Investigators subsequently interviewed an employee of UNI Auto Rental. The employee advised investigators that a female purporting to be the renter of SUBJECT VEHICLE 1 contacted him in the afternoon of July 1, 2024 and asked him to pick up the Nissan Altima from 22 Christy's Drive, Brockton, MA due to a family emergency. When asked if it was normal practice to retrieve a rented vehicle

7

after the rental period, the employee informed investigators that it was an additional charge. The employee allowed investigators to look at his recent calls, and showed investigators that he received a call from the renter of SUBJECT VEHICLE 1 from the telephone number ###-###-0092[2] at 2:55 p.m. During that call, the renter asked him to pick up the vehicle at the Brockton location. The employee also showed investigators the rental agreement information associated with SUBJECT VEHICLE 1. According to the rental agreement, SUBJECT VEHICLE 1 was rented to an adult female (PERSON 1) from Mattapan, MA from June 27, 2024, to July 1, 2024.[3]

31. The next morning, on July 2, 2024, I returned to UNI Auto Rental and spoke to the employee again. The employee informed me that he had received calls from the number ending 0092 at 10:12 p.m. and 10:22 p.m. on July 1, 2024, during which the purported renter said the employee could retrieve the keys to SUBJECT VEHICLE 1 at a particular address in Hyde Park, MA.

32. The employee also informed investigators that the vehicles registered to UNI Auto Rental contain GPS serviced by PassTime. He explained that the PassTime service application allows him to enter a vehicle and see real time movement of the vehicle. However, the application does not allow observation of the vehicle's historically traveled routes. Instead, the application documents "spot checks" of the vehicle for historical purposes. PassTime spot checks of the SUBJECT VEHICLE revealed that it was twice located at one address in Brockton and once at 22 Christy's Drive in Brockton, where the renter told the employee that it would be parked.

---

[2] Investigators know the full phone number, but for purposes of this affidavit the number is redacted.
[3] PERSON 1, whose identity is known to investigators, listed a different phone number on the rental agreement.

8

33. SUBJECT VEHICLE 1 was searched with UNI Auto Rental's consent. In SUBJECT VEHICLE 1, officers discovered a Temporary Parking Pass Permit to Stony Brook Commons,[4] valid until June 23, 2024, a CVS pharmacy receipt dated June 28, 2024, at 3:15 p.m., a tobacco product wrapper under the driver's seat, and an IHG hotel card under the rear passenger seat.

34. The Temporary Parking Pass Permit, CVS pharmacy receipt, tobacco product wrapper, and IHG hotel card were submitted for forensic testing. Latent prints were also discovered on the SUBJECT VEHICLE. Latent prints discovered on the CVS receipt and the rear window of the SUBJECT VEHICLE were returned belonging to Keywan KELLY (YOB: 1995).[5]

35. According to records held by the Massachusetts State Police, KELLY is a 29-year-old black male and is approximately 5'7" to 5'10" tall.[6] According to reports from the Weymouth and Jamacia Plain robberies, the robber was described as a slender black male, approximately 5'7" tall, and in their late twenties or early thirties. According to reports from the Hyde Park robbery, the robber was described as a black male with a small build, approximately 5'5" to 5'9", and in his 20s.

36. Additionally, I have reviewed KELLY's driver's license photograph maintained by the Massachusetts RMV, and that photograph shows that KELLY physically resembles the robber. KELLY's driver's license photograph and a still image of the robber from the Weymouth bank's surveillance footage are provided below:

---

[4] Stony Brook Commons is an apartment complex. According to business records obtained from that complex, the temporary parking pass found in SUBJECT VEHICLE 1 was issued to PERSON 3 (identified below as the renter of SUBJECT VEHICLE 2).
[5] Latent prints belonging to an adult female (PERSON 2) were also discovered on the SUBJECT VEHICLE.
[6] On various dates between 2013 and 2018, KELLY reported his height as 5'7", 5'8", 5'9", and 5'10".



37.     According to a Rockland Police Department report dated June 24, 2024, KELLY provided his phone number as (###) ###-5543 (the "SUBJECT PHONE").  T-Mobile records establish that the subscriber for the SUBJECT PHONE is an adult female who, according to BPD records, is KELLY's mother, and the subscriber address is her residential address[7] in Brockton, MA.  According to records held by the Massachusetts State Police, KELLY reported that Brockton address as his address on September 19, 2022, and January 15, 2023.  Based on the foregoing, there is probable cause to believe that KELLY is the user of the SUBJECT PHONE.

38.     The location where SUBJECT VEHICLE 1 was dropped at 22 Christy's Dr., Brockton, MA is approximately 0.4 miles away from KELLY's mother's residence in Brockton, MA.

39.     The call detail records provided by T-Mobile showed that the SUBJECT PHONE made calls to, and received calls from, the phone number from which the renter of SUBJECT VEHICLE 1 called UNI Auto Rental in the days leading up to and on the day of the Weymouth

---

[7] The address is known to law enforcement but redacted here for her privacy.

robbery. Specifically, the SUBJECT PHONE made or received calls from the number ending 0092 approximately sixteen times on July 1, 2024, including at 11:16 a.m., 11:17 a.m., 1:05 p.m., and 1:06 p.m., within the hours just before and after the robbery, and 2:52 p.m., 2:53 p.m., and 2:58 p.m., shortly before and after the renter of SUBJECT VEHICLE 1 made the call to UNI Auto Rental claiming that the car would need to be picked up in Brockton due to a family emergency.

### Connection Between KELLY and SUBJECT VEHICLE 2

40. According to records obtained from Enterprise Rent-a-Car, on July 2, 2024, an adult female (PERSON 3) rented a red Volkswagen Taos with a Florida registration and license plate number QMVA67, a vehicle resembling SUBJECT VEHICLE 2, through Enterprise's location at 500 Adams Street in Quincy, Massachusetts. The vehicle was returned by PERSON 3 after 6:00 p.m. on July 16, 2024, the day of the Jamaica Plain robbery.

41. According to call detail records provided by T-Mobile, on July 16, 2024, KELLY and PERSON 3 exchanged approximately 79 text messages and 20 phone calls, including a call at 12:56 p.m. (less than one hour prior to the Jamaica Plain robbery); 1:53 p.m. (less than fifteen minutes after the robbery); 4:53 p.m. (just over an hour before PERSON 3 returned the rental car); and 6:29 p.m. (approximately half an hour after PERSON 3 returned the rental car).

42. Based on conversations I have had with other officers involved in this investigation, I know that on July 8, 2024, officers observed the red Volkswagen Taos with Florida registration and license plate number QMVA67 parked in front of KELLY's mother's residence in Brockton, MA.

43. Investigators also obtained Ring camera footage from a residence located near KELLY's mother's residence. I have reviewed that footage. The Ring footage captures a red Volkswagen that appears to resemble SUBJECT VEHICLE 2 parked in front of KELLY's

11

mother's residence on July 15, 2024, one day prior to the Jamaica Plain bank robbery.

44. Additionally, officers obtained video surveillance footage from a residence in Chelsea, MA ("the Chelsea residence"). I have reviewed that footage. The surveillance footage shows KELLY leaving an apartment located in the Chelsea residence and entering a red Volkswagen Taos bearing Florida registration QMVA67 at approximately 10:49 a.m.[8] on the morning of July 16, 2024, the day of the Jamaica Plain robbery.

### Connection Between KELLY and SUBJECT VEHICLE 3

45. The Brockton Ring doorbell footage shows that on July 21, 2024, at approximately 4:48 p.m. and 5:36 p.m. and on July 27, 2024 at approximately 8:40 p.m., a black sedan resembling SUBJECT VEHICLE 3 was parked at KELLY's mother's residence. Based on my review of the footage, it appeared to be the same car at the residence on all three occasions.

46. Officers also obtained surveillance video footage from a nearby business in Brockton, MA. I have reviewed that surveillance footage. That footage shows that on July 27, 2024, a black BMW sedan resembling SUBJECT VEHICLE 3 turned onto KELLY's mother's street, which is a dead end.

47. I have reviewed records held by the Massachusetts RMV, and no BMW sedan is currently registered to KELLY or any resident of his mother's residence in Brockton.

48. The July 27, 2024, Brockton business surveillance footage also showed that the BMW had a cancelled registration plate bearing Massachusetts registration 3GMT43 attached to the rear of the vehicle. According to records held by the Massachusetts RMV, this plate was registered to a gray 2022 Toyota RAV4 prior to its cancellation, to a an adult male (YOB 1987)

---

[8] The timestamp on the surveillance footage shows 9:55 a.m. Investigators determined that the timestamp is approximately 54 minutes behind true time.

(PERSON 4) of Boston, MA.

49.    Based on conversations I have had with other law enforcement officers involved in this investigation, I know that on July 30, 2024, investigators observed KELLY driving a black BMW 328i.  Investigators recognized KELLY from photographs of him that they reviewed from records held by the Massachusetts State Police and Massachusetts RMV.  When investigators observed KELLY driving the BMW on July 30, the BMW bore Massachusetts registration 3HYG28.  According to records held by the Massachusetts RMV, that plate is registered to a black 2006 BMW 330XI, to another adult male (YOB 1986) (PERSON 5) of Roxbury, MA (i.e., not the vehicle to which it was affixed).

50.    Based on conversations I have had with officers from the Boston Police Department (BPD) involved in this investigation, I know that in the early morning hours of July 31, 2024, BPD officers were able to obtain the VIN number of the black BMW 328i sedan bearing Massachusetts registration 3HYG28.  A search of the Criminal Justice Information Services ("CJIS") revealed that the VIN number (WBAVC73538KX91845) belongs to a black 2008 BMW 328, registered to another adult male (YOB 1965) (PERSON 6) of Lynn, MA.

51.    Additionally, on July 31, 2024, officers were conducting surveillance an area of Roxbury, MA when they observed KELLY exit a residence in that area, walk to another street, and enter a black BMW 328i bearing Massachusetts registration 3HYG28.  KELLY drove away in the vehicle.

52.    That same day, officers observed KELLY drive the same vehicle to a locksmith located in Malden, MA.  Records from T-Mobile show that the SUBJECT PHONE made a call to a number associated with that locksmith just prior to KELLY arriving at 285 Main Street.

53.    Officers later observed KELLY park the black BMW on Lawrence Street in

Chelsea, MA. KELLY and an unknown female entered the Chelsea residence.

54. Based on my training and experience, I believe that KELLY attached two different registrations to the 2008 BMW 328i that he was seen driving and that was seen parked at KELLY's mother's residence in efforts to avoid the detection of law enforcement: first, the cancelled registration from a Toyota RAV4, and second, the plate from a 2006 BMW registered out of Roxbury.

## CONNECTIONS BETWEEN KELLY AND THE ROBBERIES

55. I believe that the same individual, specifically KELLY, was involved in the Weymouth, Jamaica Plain, and Hyde Park bank robberies. According to reports, the robber used demand notes in each robbery. Additionally, the victim tellers from each robbery reported that the robber demanded $20,000, threatened violence, and brandished a handgun. VICTIM 3 also reported that the robber retrieved the demand note; similarly, the robber from the Weymouth robbery asked for the demand note to be returned (and it was returned), and the robber from the Jamaica Plain robbery asked for the demand note to be returned (but it was not). The robbers from the Weymouth and Jamaica Plain robberies were both described as slender black males, approximately 5'7" tall, and in their late twenties or early thirties, and the robber from the Hyde Park robbery was described as a black male with a small build, approximately 5'5" to 5'9", and in his 20s. Finally, surveillance footage shows that each of the robbers brandished a gun that appeared to be a two-toned gray/silver and black handgun.

56. KELLY's fingerprints were found on the vehicle identified as the getaway car in the Weymouth robbery, and the vehicle was dropped less than half a mile from KELLY's mother's residence. Additionally, a vehicle resembling SUBJECT VEHICLE 2, which was seen leaving the vicinity of the Jamaica Plain robbery directly after the robbery, was observed at KELLY's

14

mother's residence the day prior to the Jamaica Plain robbery. Further, a vehicle resembling SUBJECT VEHICLE 2 had been rented by an individual with whom KELLY made or attempted contact nearly 100 times on the day of the robbery, KELLY was observed entering and driving that vehicle on the morning of the robbery, and that vehicle was returned the same day as the robbery. Finally, as set forth herein, a vehicle matching the appearance of the vehicle used as the getaway car in the Hyde Park robbery (SUBJECT VEHICLE 3) was observed at KELLY's mother's residence the day after the Hyde Park robbery, and officers observed KELLY driving the same vehicle.

## SEARCH WARRANTS

57. I obtained federal search warrants from this Court on July 25, 2024 and August 1, 2024 for information associated with the SUBJECT PHONE, including information about its location. *See* 24-mj-8400-PGL, 24-mj-8474-PGL (the "Search Warrants").

58. On July 30, 2024, T-Mobile provided information regarding the location of the SUBJECT PHONE in response to the Search Warrant served on July 25, 2024. While the analysis of that information is ongoing, preliminary review shows that the SUBJECT PHONE appears to have been disconnected from the network at the time of the Weymouth and Jamaica Plain robberies. Specifically, the SUBJECT PHONE was disconnected from the network from 10:01 a.m. to 11:54 a.m. on July 1, 2024, and from 1:11 p.m. to 1:53 p.m. on July 16, 2024. Based on my training and experience, one possible reason that the SUBJECT PHONE could have been disconnected from the network is that the SUBJECT PHONE was powered off or placed in airplane mode.

59. Additionally, the data from T-Mobile shows that on July 1, 2024, at approximately 11:54 a.m. (approximately two minutes after the Weymouth robbery), the SUBJECT PHONE

recorded a transaction with a cell tower located in the vicinity of 95 Broad St., Weymouth, MA, which is approximately .78 miles from the location of the Weymouth robbery. On July 16, 2024, at approximately 1:53 p.m. (approximately twelve minutes after the Jamaica Plain robbery), the SUBJECT PHONE recorded a transaction with a cell tower located in the vicinity of 5 Station St., Brookline, MA, which is approximately .79 miles from the location of the Jamaica Plain robbery.

60.     On August 9 and 12, 2024, T-Mobile provided data in response to the Search Warrant served on August 1, 2024. While the analysis of that information is ongoing, preliminary review shows that the SUBJECT PHONE appears to have been disconnected from the network at the time of the Hyde Park robbery. Additionally, the data shows that at approximately 9:07 a.m. (approximately an hour before the Hyde Park robbery), the SUBJECT PHONE recorded a transaction with a cell tower located in the vicinity of 1530 River Street, Boston, MA, which is approximately .62 miles from the location of the Hyde Park robbery. The SUBJECT PHONE's next recorded transaction was at approximately 11:46 a.m., with a cell tower in the vicinity of the Chelsea residence.

61.     Based on my training and experience and the other facts outlined herein, I believe that this preliminary data shows that KELLY, the user of the SUBJECT PHONE, likely turned off the phone at the time of each robbery in an effort to avoid identification or detection by law enforcement.[9]

---

[9] Based on preliminary review of the real-time GPS data provided by T-Mobile, it appears that the SUBJECT PHONE does not disconnect from the network on a regular basis. From August 2, 2024 through this date, the SUBJECT PHONE has consistently connected to the network. The longest period in which the SUBJECT PHONE did not connect to the network during this period was for approximately 40 minutes on August 12, 2024 around 2:00 a.m.

## CONCLUSION

62.  Based on the foregoing, there is probable cause to conclude that on or about July 1, 2024, July 16, 2024, and July 26, 2024, in Massachusetts, KELLY did, by force and violence, or by intimidation, take from the person or presence of another, any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association, in violation of 18 U.S.C. § 2113.

*Michael B. Traister /by Paul G. Levenson*
Michael B. Traister
Trooper, Massachusetts State Police

SUBSCRIBED and SWORN to via telephone in accordance with Fed. R. Crim. P. 4.1 on August 13, 2024.

HON. PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS